| In Re:<br><br>**JOSEPH DINARDO.**<br><br>          **Debtor** | Chapter 7<br><br>**Case No: 1-23-10316-CLB**<br><br>**HON. CARL BUCKI** |
|---|---|
| **ELISSA D. MILLER, chapter 7 trustee for the estate of Girardi Keese,**<br><br>          **Plaintiff,**<br><br>      **vs.**<br><br>**JOSEPH DINARDO, and THE DINARDO LAW FIRM, PC.**<br><br>          **Defendants** | **Adv. No.:**<br><br>**COMPLAINT TO DENY DISCHARGE**<br><br>**[11 U.S.C. §§ 523(a)(2)(A) and (c)]** |

For her "Complaint to Deny Discharge" under section 11 U.S.C. §§ 523(a)(2)(A) and (c) against the Debtors Joseph DiNardo ("DiNardo"), [Case No. 1-23-10316-CLB] and The DiNardo Law Firm ("TDLF"), [Case No. 1-23-10865-CLB] Plaintiff, Elissa D. Miller, solely in her capacity as the duly appointed, qualified and acting chapter 7 trustee for the bankruptcy estate of *In re Girardi Keese*, ("GK Trustee") pending in the United States Bankruptcy Court, Central District of California, Case No. 20-bk-21022-BR, alleges as follows:

## JURISDICTION AND VENUE

1.      This adversary proceeding is brought pursuant to 11 U.S.C.S. § 523 and Rule 7001(6) of the Federal Rules of Bankruptcy (the "Bankruptcy Rules") as an objection to the dischargeability of the debtor's debt owed and therefore is a core proceeding under 28 U.S.C.S. § 157(b)(2)(I) and (J) and 28 U.S.C. § 1334(a).

2.      Venue of this bankruptcy case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 (a) in that the instant proceedings arises in and is related to the case, *In re Joseph DiNardo,* Case No.: 1-23-10316-CLB, a chapter 7 bankruptcy case filed in the United States Bankruptcy Court for the Western District of New York, which case is still pending; and, *In re The*

*Nardo Law Firm*, Case No. 1-23-10865-CLB, a chapter 7 bankruptcy case filed in the United States Bankruptcy Court for the Western District of New York, which case is still pending. The GK Trustee consents to entry of a final judgment by the Bankruptcy Court.

**PARTIES**

3.       The GK Trustee is the duly appointed, qualified, and acting Chapter 7 Trustee in the GK Bankruptcy Case. The GK Trustee is a non-listed creditor of the Joseph DiNardo bankruptcy estate, as presented in an adversary action pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division, *Miller v. DiNardo*, Adversary Case No. 2:22-ap-01169-BR. [Dkt. #1]  A true and correct copy of the *Miller v. DiNardo* Adversary Complaint is attached hereto as **Exhibit 1** and is incorporated herein by reference as though fully set forth.[1]

4.       This adversary proceeding is also brought by the GK Trustee as the assignee of the claims filed by Joseph Ruigomez, Kathleen Ruigomez and Jamie Ruigomez, (collectively the "Ruigomez Clients") in the DiNardo Bankruptcy Estate, Claim No. 5, 5-1 for $6,350,000. A true and correct copy of the claim is attached hereto as **Exhibit 2** and is incorporated herein by reference as through fully set forth. A true and correct copy of the assignment of the claim from the Ruigomez Clients to the GK Trustee is attached hereto as **Exhibit 3** and is incorporated herein by reference as though fully set forth.

5.       Defendant, Joseph DiNardo ("DiNardo") is an individual and the Debtor in the now pending chapter 7 Bankruptcy Case, *In re Joseph DiNardo,* Case No. 1-23-10316-CLB.

---

[1] The action was  filed as an adversary action against two commercial litigation funders, Counsel Financial Services, LLC ("CFS"), California Attorney Lending II, Inc. ("CAL II") in addition to DiNardo. On February 16, 2023, the Bankruptcy Court dismissed the Trustee's Complaint against CFS, CAL II and Joseph DiNardo without leave to amend. [Dkts. 79 (CFS and CAL II), 80 (Joseph DiNardo)] The Bankruptcy Court's decision was reversed by the District Court. See *Miller v. DiNardo*, 2024 U.S. Dist. LEXIS 236718 (D.C. Cal. 2024). Prior thereto the Bankruptcy Court approved the Trustee's settlement with CFS and CAL II. [Dtk. 384, Dtk. 1737]

2

6.     Defendant, The DiNardo Law Firm, is a professional law corporation and the Debtor in the pending chapter 7 Bankruptcy Case, *In re The DiNardo Law Firm, PC.*, Case No. 1-23-10865-CLB.

## PROCEEDINGS

### A. Joseph DiNardo Bankruptcy Proceedings

7.     DiNardo instituted his bankruptcy proceeding by filing a voluntary petition under Title 11, Chapter 11, on April 10, 2023 (the "Petition Date"). [Dkt. #1]

8.     The DiNardo bankruptcy was converted to a chapter 7 proceeding by order of the Bankruptcy Court entered on October 29, 2024. [Dkt. # 178]

### B. The DiNardo Law Firm Chapter 7 Proceedings

9.     DiNardo's law firm, "The DiNardo Law Firm" ("TDLF") filed a voluntary petition under Title 11, Chapter 11, on September 8, 2023, Case No. 1-23-10865-CLB. [Dkt. # 1]

10.     On September 9, 2024, the bankruptcy court entered its order converting TDLF's chapter 11 bankruptcy to chapter 7. [Dkt. # 69]

## STATEMENT OF FACTS

### A. DiNardo's Background

11.     Joseph DiNardo was first licensed to practice law in the State of New York in 1973. He specialized in plaintiff contingency litigation and was heavily involved in asbestos litigation for over 26 years.

12.     In or around 1997, DiNardo was charged with tax fraud and paying kickbacks to an Erie County lawmaker and union official who allegedly steered cases on behalf of the International Iron Workers Union to DiNardo's firm. DiNardo pleaded to lesser offenses, was fined and sentenced to two years' probation, six months of which DiNardo was ordered confined to house

3

arrest. He was also suspended from the practice of law; and, required to pay a $20,000 fine. *United States v. DiNardo,* 2000 U.S. Dist. LEXIS 82.

## B. DiNardo's Litigation Funding Business

13.     In 2000 DiNardo together with attorneys Perry Weitz and Arthur Luxenberg formed Counsel Financial Services, LLC, ("CFS"). CFS provides litigation funding to plaintiff lawyers.[2] DiNardo was appointed CFS' CEO and director. At or about the same time, DiNardo purchased Plaintiff Support Services, Inc. ("PSS"). PSS was engaged in another aspect of litigation funding, to wit: loaning money to individual plaintiffs prior to resolution of the plaintiff's personal injury claim. On July 11, 2011 California Attorney Lending II, Inc., ("CAL II") was formed as a Delaware corporation and shortly thereafter, secured a California commercial lending license. CAL II was affiliated with CFS. Over the next few years DiNardo also formed, owned, operated, or managed other companies engaged in various aspects of litigation funding, including Blue Ocean, LLC., D&D, Funding, LLC and D&D Funding II, LLC, and PS Funding, LLC.

14.     In 2004, DiNardo's license to practice law in the State of New York was reinstated. At or about the same time, DiNardo formed The DiNardo Law Firm, P.C. ("TDLF"). DiNardo did not actively engage in the practice of law after his conviction in 2000. Rather, DiNardo used the law firm as a vehicle to refer business to other attorneys in exchange for a percentage of the fees the lawyer received for handling the case. In addition, DiNardo either individually or through TDLF would provide litigation funding to 3rd party lawyers in exchange for a percentage interest in the 3rd party lawyers contingency fee case(s).   To avoid various state laws, rules and regulations prohibiting

---

[2] Litigation finance (also called litigation funding or legal financing) is the practice where a third party unrelated to the lawsuit provides capital to a plaintiff or the plaintiff's lawyer involved in litigation for a return of the lender's principal plus an interest rate that is typically in excess of 18% per annum. The loan is secured by a lien against the plaintiff's recovery or the lawyers' fees. The industry unregulated.

the payment of referral fees, or to avoid state commercial lending licensing laws DiNardo took on the role of "co-counsel" notwithstanding he never actually performed any services for the client.[3]

### B. TDLF as DiNardo's Alter-Ego

15.     At all times relevant, Defendant TDLF was the alter-ego of Defendant DiNardo and there exists, and at all relevant times has existed, a unity of interest and ownership between Defendant DiNardo and TDLF such that any separateness between them has ceased to exist in that Defendant DiNardo completely controlled, dominated, managed and operated Defendant TDLF to suit his convenience and personal interests.

16.     Specifically, at all relevant times, DiNardo (1) was the sole attorney employed by TDLF and TDLF's sole owner,  (2) controlled the business and affairs of TDLF, (3) inadequately capitalized TDLF (4) disregarded legal formalities by failing to maintain minutes or adequate records, and/or failed to maintain arm's length relationship with the corporate entity, (5) failed to properly document various financial transactions in an effort to circumvent New York Rules of Professional Conduct, (4) commingled the funds and assets of TDLF with his own personal funds, and/or diverted the aforesaid funds and assets to the detriment of creditors, (5) held himself out as personally liable for the debts of TDLF, (7) used the corporate entity as a mere shell, instrumentality or conduit for his personal businesses for a single venture, (8) used the corporate entity to perpetrate frauds by entering into fraudulent co-counsel relationships so as to avoid prohibitions against the sharing of legal fees for referrals made to other attorneys; and (9) used the corporate entity  as a commercial litigation funder to circumvent state licensing requirements for commercial lenders using the ruse that the litigation funding loans made by TDLF were "co-counsel" arrangements.

---

[3] Rule 7.2(a) of the New York Rules of Professional Conduct (the "Rules") prohibits a lawyer from compensating a person or organization for recommending the lawyer's employment by a client, unless the client agrees to the relationship and the fee sharing agreement. California Rules of Professional Conduct contain a similar limitation. See, CRPC, § 1.5.1.

### C.  DiNardo's Relationship with California Attorney Thomas V. Girardi

#### 1.  General Background: Thomas V. Girardi

17.     Thomas V. Girardi ("Girardi") was admitted to the California State Bar on January 13, 1965, State Bar No. 36603. In or around 1976 he established the law firm, Girardi & Keese, a California law partnership ("G&K").  Over the years, GK became a nationally known plaintiff's law firm based upon Girardi's legal prowess, who for decades often was appointed lead or co-lead is mass tort cases of national significance. He was the first trial lawyer to serve on the California Judicial Council, the policymaking body of the California courts. His marriage to reality television star Erika (Jayne) Girardi ("Erika") put his professional persona in the public limelight.

#### 2.  Girardi's Criminal Conduct, His Disbarment and Conviction for Wire Fraud

18.     In December 2020, the Honorable Thomas M. Durkin (N.D. Ill.) held Girardi in contempt for violating the court's order to pay his Lion Air Crash clients $2 million, despite having received settlement funds from Boeing 11 months earlier. Judge Durkin subsequently ordered that all assets of Girardi and Girardi Keese be frozen and made a criminal referral to the Department of Justice. [4]

19.     The foregoing events led to GK's bankruptcy (*In re Girardi Keese*, Bankr. C.D. Cal., Case No. 2:20-bk-21022-BR; Bankr. Dkt. 1); Girardi's personal bankruptcy *(In re Thomas V. Girardi*, Bankr. C.D. Cal., Case No. 2:20-bk-21020-BR; Bankr. Dkt. 1); Girardi's disbarment (*In re Thomas V. Girardi* on Discipline, Cal. Supreme Court, Case No. S273491); Girardi's indictments in California on five counts of wire fraud under 18 U.S.C. § 1343 (*USA v. Thomas V. Girardi*, Cr. No. 23-00047-JLS, C.D. Cal. 2023); and, one count of wire fraud under 18 U.S.C. § 1343. (*USA v. Thomas V. Girardi,* 23-CR-54). True and correct copies of the California and Illinois indictments are attached as **Exhibits 4-5** and are incorporated herein by reference as though fully set forth.

---

[4] *In re Lions Air Crash*, N.D. Ill., 1:18-cv-07686.

20.     On August 27, 2024, the California District Court in *USA v. Girardi,* Cr. No. 23-00047-JLS entered the verdict of the jury in this action. The jury found Girardi guilty on four counts of wire fraud, 18 U.S.C. § 1343. A true and correct copy of the Verdict and Judgment is attached hereto as **Exhibit 6** and are incorporated herein by reference as though fully set forth.

21.     Girardi not only stole millions of dollars from GK Clients but between 2013-2020 GK and over the years, Girardi and GK controlled extensively commingled Girardi's and his related business entities with trust funds from clients in GK's IOLTA accounts, such that GK Bankruptcy Court determined that the funds in the trust and IOLTA accounts constituted property of the estate. [GK Dkt. #1898]

22.     As of the GK Bankruptcy (December 18, 2020) 90 GK client cases had a "net' negative balance totaling $24,682,028 including but not limited to case 29048 *Estate of Mong Qui Sun v DW Tours* (negative $7,094,900); case 21101 *Rezulin* (negative $2,833,663); and, case 25198 *Bextra/Celebrex* (negative $1,851,279).  In addition, Girardi stole $10 million of the Ruigomez settlement funds received in the Ruigomez action against PG&E as hereinafter described.

### 3.   DiNardo and Girardi's Illegal Fee Sharing Arrangements and DiNardo's Receipt of Money from GK

23.     Prior to 2014, DiNardo, either individually or on behalf of TDLF, and Girardi, on behalf of GK, entered into at least four agreements to share fees earned by GK from representing plaintiffs in personal injury cases. Upon information and belief, the GK Trustee alleges that DiNardo and Girardi misrepresented these agreements as "co-counsel" fee-sharing agreements, despite DiNardo's sole contribution being the advancement of funds to GK for litigation costs. These agreements were in violation of California and New York's Rules of Professional Conduct as GK clients never provided their written approval for the fee-sharing arrangements or for the amount of the co-counsel fees. The GK Trustee is further informed, believes and based thereon

alleges that the "co-counsel" arrangements between Girardi and GK were disguised loan agreement, intended to avoid California's commercial broker licensing law, as DiNardo did not have a California commercial lending license. [Cal. Financial Code § 22100 et seq.]

24.    Between 2010 through 2016 GK paid DiNardo or TDLF $7,303,101.50 in alleged "Co-Counsel" fees or "Interest" as follows:

| Date | DG Client # | Case | Relationship | Amount Paid | Fees Not Paid |
|---|---|---|---|---|---|
| | Streeper | *Streeper v. PG&G (San Bruno)* | Assoc. Counsel Fees | $156,000.00 | |
| | Balagot | *Balagot, Carlos & Yamamoto, Lindsay v. PG&E (San Bruno)* | Assoc. Counsel Fees. | | $ 284,704.00 |
| 2.12.2013 | Ruigomez | *Ruigomez v. PG& E* | Assoc. Counsel Fees | $5,825,000.00 | |
| 5.20.2013 | Ruigomez | *Ruigomez v. PG& E* | Assoc. Counsel Fees | $500,000.00 | |
| 1.29.2016 | | Joseph DiNardo | Interest Expense | $75,000.00 | |
| 7.12.2016 | Chen | *Chen, Hairu v. TBE In'll, Inc., et al.* | Assoc. Counsel Fees | $400,000.00 | |
| 7.21.2016 | Chen | *Chen, Hairu v. TBE In'll, Inc., et al.* | Assoc. Counsel Fees | $578,101.50 | |
| | | | | | |
| Total Paid | | | | $7,534,101.50 | $ 284,704.00 |

25.    As set forth above Girardi and DiNardo implemented unlawful fee sharing agreements pertaining to several GK representations pursuant to which TDLF received $7,459101.50.  In addition, Jospeh DiNardo received $75,000 from GK on January 29, 2016, which is identified on GK books and records as an "Interest Payment".   The total payments made by GK to DiNardo or TDLF, $7,534,101.50

    a.    **The Streeper Representation**

26.    On November 11, 2011, Girardi paid DiNardo or the DiNardo law firm, $156,000.00 as "co-counsel fees". In a letter dated November 11, 2011, Girardi wrote to DiNardo:

8

> Dear Joe:
> Good news. After a week in trial, we settled *Streeper vs. City of Perris* for $800,000. This truly was a very difficult case. The plaintiffs boyfriend (uninsured) pulls a left turn in front of the other vehicle. It was a construction site so our claim was that it was a dangerous situation. The judge made some great ruling in our favor and caused the defendants to rethink the situation. Total legal fees in the case will be $320,000. Our fees to you will be $160,000 minus anything Hatcher claims.

A true and correct copy of the November 11, 2011 letter is attached hereto as **Exhibit 7** and is incorporate herein as through fully set forth.

### a.    The Ruigomez Representation

27.     On September 9, 2010, at 6:11 p.m. PDT, a 30-inch (76 cm) steel natural gas pipeline owned by Pacific Gas & Electric exploded in the Crestmoor residential neighborhood of San Bruno, California, about 2 miles (3.2 km) west of San Francisco International Airport. The explosion and ensuing fire destroyed thirty-seven homes.

28.     As of September 29, 2010, the death toll stood at eight. Among the victims was 20-year-old Jessica Morales, who was at the epicenter of the fire with her boyfriend, Joseph Ruigomez, at his home on Earl Avenue. Joseph suffered burns over 90% of his body but survived after five months of recovery at the Saint Francis Memorial Hospital Burn Center.

29.     On October 1, 2010, the Ruigomez family, including Joseph, retained Girardi and GK to represent them in a personal injury case against PG&E. GK agreed to a contingency fee arrangement of 25% of the total recovery after costs. The case was assigned to Girardi and GK attorney Robert Finnerty.

30.     A year later, on or about November 1, 2011,  DiNardo sent Girardi a writing purporting to be a co-counsel fee sharing agreement, pursuant to which  TDLF would get 50 % of the fees earned from GK's representation of the Ruigomez client, subject to minor adjustments. A true and correct copy of the November 1, 2011 letter is attached hereto as **Exhibit 8** and is incorporated herein by reference as though fully set forth.

31.     The GK Trustee is informed, believes, and based thereon alleges that neither DiNardo or TDLM perform any legal services on the Ruigomez matter, that an invoice for TDLF's services was not issued and that there are no time records by DiNardo or TDLF to support the payment of fees made on the Ruigomez matter. The Trustee is further informed, believes and based thereon alleges that the total amount of funding provided by DiNardo or TDLF for the Ruigomez matter was $150,000.

32.     The Ruigomez clients did not know of the "co-counsel "relationship between DiNardo and Girardi for their representation, nor did the Ruigomez approve of the co-counsel / fee sharing agreement between DiNardo, TDLF and Girardi and GK.

33.     In or around December, 2012, Girardi settled the Ruigomez case, without the knowledge or consent of the Ruigomez clients. The terms of the settlement provided that Ruigomez would be paid $53,000,000 for a release all of the Ruigomez claims.

34.     On or about January 10, 2013, Girardi told Ruigomez that the case had settled. Girardi had not previously informed Ruigomez of the settlement or obtained Ruigomez consent to the terms of the settlement and concealed the true terms of the settlement from Ruigomez. Rather, Girardi falsely represented to Ruigomez that the total settlement amount was approximately $7,250,000 and concealed from Ruigomez that the true amount of the settlement was $53,000,000. Girardi further falsely represented that the settlement would be structured as an annuity to be paid to Ruigomez for the rest of Joseph Ruigomez life when, as Girardi then knew, the settlement terms did not require the creation of an annuity or any other structured settlement, and Girardi had not obtained Ruigomez consent to so structure the settlement.

35.     On or about January 24, 2013, over half of Ruigomez settlement, namely, $28,000,000 was transferred to the GK Torrey Pines IOLTA Account. Girardi was provided notice of the incoming wire that same day. Girardi then misappropriated and embezzled a portion of

10

Ruigomez settlement funds and caused those funds to be used to pay other expenses and liabilities of Girardi Keese unrelated to Ruigomez, including payments to other Girardi Keese clients whose own settlement funds had previously been misappropriated by Girardi

36.    In order to lull Ruigomez and prevent Ruigomez from discovering that Girardi had embezzled Ruigomez settlement funds, Girardi committed and caused the following acts to be committed, among others:

i.    Falsely informing Ruigomez that their settlement "should be tax-free," and that delays in payment of settlement funds to Ruigomez were due to Girardi's efforts to remove any tax liability for Ruigomez when, as Girardi then knew, the Ruigomez settlement was not taxable.

ii.    Falsely informing Ruigomez that their settlement funds had been transferred into a separate interest-bearing account when, in fact, no such transfers had been made and no such separate interest-bearing account containing Ruigomez settlement funds existed.

iii.    Falsely informing Ruigomez that their settlement funds were "locked up" for a six-month period due to their deposit into the separate interest-bearing account when no such separate interest-bearing account existed.

iv.    Sending and causing to be sent lulling payments to Ruigomez as purported "interest payments" deriving from the supposed separate interest-bearing account.

v.    Sending and causing to be sent letters to Ruigomez falsely claiming that "we worked magic so far in getting these huge interest rates and getting the first two years tax-free."

vi.    Sending and causing to be sent letters to Ruigomez falsely attributing delays in the payment of settlement funds to Ruigomez to supposed court oversight of the distribution of settlement funds when, in fact, no such court oversight was required or existed. And,

11

vii.    Sending and causing to be sent, on July 1, 2019, a check for $2,500,000 to Ruigomez
        purportedly as a disbursement of Ruigomez settlement funds, which funds were, as
        Girardi then knew, settlement proceeds belonging to Client 4 and Client 5 (as described
        in the Indictment), and not Ruigomez settlement proceeds, which Girardi had already
        spent and caused to be spent through disbursements unrelated to Ruigomez.

37.     On February 12, 2013, Girardi issued a $5,825,000 check payable to The DiNardo
Law Firm for "Assoc Counsel Fees" for the Ruigomez representation. The check was drawn against
the GK Nano Bank ILOTA client's trust account. A true and correct copy of the check is attached
hereto as **Exhibit 9** and is incorporated herein by reference as though fully set forth.

38.     On May 20, 2013, Girardi issued a $500,000 check, drawn on the GK Trust Client
Account, payable to The DiNardo Law Firm for "Assoc Counsel Fees". A true and correct copy of
the check is attached hereto as **Exhibit 10** and is incorporated herein by reference as though fully
set forth.

39.     The Ruigomez clients did not approve or consent in writing to the payment referred
to in paragraphs 37 and 38 above.

40.     Upon receipt of the $6,325,00, DiNardo allegedly transferred one-half of the amount
($3,162,500.00) to another litigation funding company D&D Funding, LLC. D&D Funding was a
litigation funding company owned and operated by DiNardo and one Christopher E. Diamantis.

## C. DiNardo's Actual Knowledge of Girardi's Criminal Enterprise and His Participation in the Same

41.     As hereinabove alleged, DiNardo, is a licensed attorney, and therefore had actual
knowledge of and participated in illegal fee sharing agreements as specifically alleged in paragraphs
23-40 above which paragraphs are incorporated herein by reference as though fully set forth.

42.     To the extent DiNardo's participation in the representations set forth in paragraphs

12

25-40 above, were "litigation financing arrangements," DiNardo and/or TDLF's financing as presented above were illegal commercial loans as neither DiNardo nor TDLF was licensed in the State of California to engage in the commercial lending business. As an attorney, and as an individual engaged in making commercial litigation financing loans, DiNardo had actual knowledge of California's commercial loan licensing laws and had actual knowledge that his and Girardi's structuring the loan agreements as "co-counsel" agreements was a ruse to avoid California's commercial licensing laws.

43.     By extending litigation funding to Girardi and GK, DiNardo, either individually or through TNLF, with actual knowledge of the illegality of the co-counsel agreements or the loan agreements, DiNardo and TDLF aided and abetted Girardi's criminal enterprise which in turn provided Girardi and GK the ability to continue prosecute plaintiff actions which resulted in Girardi stealing settlement funds for his own benefit or to pay other clients whose funds Girardi had previously stolen and or used for improper purposes. Moreover, DiNardo and TDLF received 50% of the fees earned by Girardi / GK representations illegally financed by DiNardo or TDLF and benefited thereby in excess of $7.5 million.

**F. DiNardo Gave Substantial Assistance to Girardi's Criminal Enterprise in Arranging for Millions of Dollars Funding Loans From CAL II**

44.     In 1996, California attorney Ed Masry, his firm Masry & Vititoe, together with his assistant, Erin Brockovich, investigated and brought to light the PGE/Hinkley Toxic Waste case. In 2005, Ed Masry died. Four years later, in 2009, the firm filed for bankruptcy in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, bearing Case no. 1:09-bk-20447-MT, styled *In re Masry & Vititoe,* The firm's largest secured creditor was CAL II as set forth in the Claim filed by CAL II in the amount of $25,784,026.11, accruing interest at 18%

per annum. Masry & Vititoe's largest unsecured creditor Joseph DiNardo, who filed a Claim for $675,000.

45.     In 2011, Masry & Vititoe ("Masry"), acting as debtor-in-possession, filed a disclosure statement [Dkt. # 278] describing its chapter 11 plan of reorganization/liquidation: a plan designed so that once confirmed the firm would exit bankruptcy. [Docket No. 279]  The terms were presented in a Memorandum of Understanding ("MOU") described in the Disclosure Statement and attached to the plan.  The MOU provided for a division of the income the estate was to receive from the contingency fees earned by the Masry firm post-confirmation.  DiNardo then arranged for transfer of the vast majority of the Masry firm's cases to Girardi Keese for Girardi Keese to handle. The plan, as described in the disclosure statement, was confirmed by court order on May 27, 2011. [Docket No. 317]  The Masry plan provided for Girardi Keese and the reorganized Masry firm to split 50% of the contingency fees earned from a Masry case handled by GK, with the other 50% paid to the Masry firm's bankruptcy estate.  That money, in turn, would be used to pay certain cash advances CAL II made to the Masry firm, to pay the estate's administrative expenses with the balance divided 90% to CAL II as the secured creditor and the remaining 10% to be paid to certain designated creditors, including DiNardo.  In addition, CFS was to serve as the disbursing agent for the confirmed Masry plan, thus received a % of the amount serviced by CFS.

46.     In or around  July  2011, DiNardo helped facilitate a litigation funding line of credit for Girardi Keese from CAL II, an affiliated company of CFS, pursuant to which CAL II provided Girardi Keese with a $3,500,000 litigation funding line of credit with an interest rate of 18% per annum. [5]  The letter provides:

> Dear Joe:
>
> Just to give the bank a comfort level, we have reached a tentative agreement in
> Avandia.  The terms are absolutely confidential, but for your information only the

---

[5] At his 341(a) examination DiNardo testified that CFS and CAL II were essentially one and the same.

settlement is $80,000 per person. I'm enclosing part of the agreement which has not been fully agreed to. We have 4,223 cases. All but a handful will be approved and the total settlement would be $328 million. The firm's fees will be $98,400,000. We will also be entitled to the return of costs (approximately $14 million).

47.     Girardi's disclosure of the settlement breached the confidentiality of the settlement discussions. Having actual knowledge that Girardi breached his fiduciary obligations to his clients, DiNardo used this information to facilitate the CAL II loan to GK.

48.     DiNardo arranged the loans for GK from CAL II, with actual knowledge that his co-counsel fee sharing agreements with Girardi were illegal and fraudulent in that (1) the clients did not approve of the agreements or payments made thereunder in writing and (2) the co-counsel fee sharing agreements were a ruse to avoid California Commercial Lending licensing laws.

49.     In or about August, 2011, DiNardo facilitated CAL II increasing its GK litigation funding line to $5,000,000 in accordance with a "First Amended and Restated Revolving Promissory Note," and a "First Amended and Restated Security Agreement," both dated August 12, 2011.

50.     On or about August 1, 2013, CAL II renewed, but did not increase Girardi Keese's funding agreement pursuant to a "Second Amended and Restated Revolving Promissory Note" in the principal amount of $5,000,000. In the concurrently executed "Second Amended and Restated Security Agreement," Girardi Keese granted CAL II a blanket lien on all of its assets, including the attorneys' fee proceeds from all its cases.

51.     Between 2016-2018 Girardi Keese secured additional litigation funding from (1) Stillwell Madison ("Stillwell") ($5,110,440.38); Law Finance Group ("LFG") ($15,000,000) and Virage SPV 1, LLC ("Virage")($9,000,000).

52.     In or around July 11, 2017 at the urging of DiNardo, CAL II renewed and increased its capital position in Girardi Keese to $6,000,000 pursuant to a "Third Amended and Restated Revolving Promissory Note" and a "Third Amended and Restated Security Agreement." The security agreement purportedly continued the unlimited blanket security interests in all of the same

15

assets which secured the renewed 2013 loan. At this time, CAL II's "loan" to Girardi Keese had been outstanding since 2011 and had not been repaid in full or in part, nor has any interest payment made by GK to CAL II.

### 3. DiNardo's Participation in GK's Financial Affairs

53.     In or around February 2019, DiNardo with actual knowledge of Girardi's fraudulent schemes, including DiNardo's actual participation in the same, further inserted himself in the financial affairs of Girardi Keese, at first recommending that GK hire an outside Chief Restructuring Officer, Robert Cohan of Simba Capital, to address GK financial affairs. This included reviewing GK's financial records to understand Girardi Keese's liquidity issues and to develop a work-out program for GK. Based upon that recommendation, Mr. Cohan was retained for the purposes set forth above and continued working with GK and DiNardo through September 2019.

54.     In or around September 2019, after learning that GK had (1) secured other third-party "litigation financing loans" in violation of the CAL II loan terms and conditions, and (2) defaulted on those loans, DiNardo, on behalf of Girardi Keese, began negotiating with Girardi Keese's other lenders in an effort to settle the litigation and to work out terms and conditions of repayment. Among other things, DiNardo:

i.      Offered to pay for the services of Cohan.

ii.     Facilitated a restructuring of the CAL II loan including obtaining additional funding from CAL II which result in a November 8, 2019, agreement that extended and increased Girardi Keese's CAL II line of credit from $6,500,000 to $8,000,000.

iii.    Facilitated a modification of the amount Girardi had promised to pay CAL II from the *Lions Air* settlement to half of what Girardi originally promised to pay as a condition of the November 8, 2019 increase credit facility.

iv.     Attempted to arrange for additional litigation financing for GK, including

16

promising to personally guarantee GK lending obligations.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## [NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD, 11 U.S.C. §523(a)(2)(A))]

55.     The GK Trustee repeats and realleges paragraphs 11 through 54 above as though fully set forth herein.

56.     Commencing in or around 2010 and continuing through 2020 DiNardo, individually or through TDLF, knowingly and intentionally conspired with Thomas V. Girardi to evade California's Financial Commercial Licensing Law, California Financial Code Section § 22100 et seq. by entering into funding agreements disguised as "co-counsel fee sharing agreements" pursuant to which DiNardo, individually or through TDLF (neither of which were licensed by the State of California as commercial financers) provided litigation financing for certain GK plaintiff representations in exchange for receiving a 50% interest in the attorney fees GK received from the financed representation.

57.     The disguised "co-counsel fee sharing agreements identified above, were entered into and carried out without GK's client's knowledge or consent, and that fees were shared between GK and DiNardo and or TDLF without the client's written authorization in violation of California's Rules of Professional Conduct, Rule 1.5.1 (previously Professional Rules of Professional Conduct, Rule 2-200).

58.     The conduct described in paragraphs 11-54 constitute false pretenses, false representations or actual fraud and were perpetrated in an attempt to avoid California Lending licensing laws, and California Rules of Professional Conduct prohibition against fee sharing agreements without the actual knowledge and written consent of the clients.

17

59. The total amount of money DiNardo and TDLF obtained by such false pretenses, false representations or actual fraud was $7,534,101.50

60. DiNardo and or TDLF's debt to the GK estate is a debt for money, property, or services obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## SECOND CLAIM FOR RELIEF

## [NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY, EMBEZZLEMENT, OR LARCENY, 11 U.S.C. §523(a)(4)]

61. The GK Trustee repeats and realleges paragraphs 11-54 above and incorporates the same herein by reference as though fully set forth.

62. As heretofore presented in November 2011, DiNardo and TDLF and Girardi and GK entered into a purported "co-counsel" fee sharing agreement, thus creating a fiduciary relationship between DiNardo and TDLF, Girardi and GK and the Ruigomez clients.

63. In around February 2013, DiNardo and TDLF, Girardi and GK breached their fiduciary duty owed to the Ruigomez clients, by:

a. Paying DiNardo and or TDLF $6,350,000 purportedly from the fees earned by GK for the Ruigomez representation without obtaining the Ruigomez' written consent for the fee payment in violation of California Rules of Professional Conduct.

b. Girardi's stealing of over $10 million out of the settlement funds received by Girardi from PG&E that should have been paid to the Ruigomez clients.

c. DiNardo and TDFL's aided and abetted Girardi's theft by and therefore breach their fiduciary duty owed to the Ruigomez clients by intentionally, willingly and with actual knowledge that litigation financing DiNardo and or TDFL provided GK for the Ruigomez

18

PG&E litigation, violated California's Financial Code's licensing provisions, and by entering into a fraudulent fee sharing agreement to avoid the California's Financial Code and by intentionally, willingly and with actual knowledge accepting $6,350,000 as purported fees for services knowing that neither DiNardo or TDFL provided any legal services to the Ruigomez clients and that the Ruigomez clients never agreed in writing to the payment of any fees to DiNardo or TDLF.

64.     DiNardo and or TDLF's debt to the GK estate and through the Ruigomez assignment of its claim, is a debt for money, property, or services obtained by false pretenses, false representations or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

65.     The total amount obtained by DiNardo and or TDLF from their breach of fiduciary obligations owed to the Ruigomez clients is $6,350,000.

WHEREFORE, Plaintiff, Elissa D. Miller, solely in her capacity as the duly authorized and appointed chapter 7 Trustee for the Estate of Girardi Keese, prays for judgment as follows:

1. For a determination that DiNardo and The DiNardo Law Firm are indebted to the Plaintiff in the amount of $7,534,101.50 and the debt owing the GK Trustee is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

2. For a determination that DiNardo and The DiNardo Law Firm are indebted to the Plaintiff, as the assignee of the Ruigomez claim, in the amount of $6,350,000 and that the debt owing the GK Trustee is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

3. For such other and further relief as this case may require and the Court deems it just and proper.

*Signatures on following pages:*

19

Dated:    February 3, 2025

**JENKINS, MULLIGAN & GABRIEL, LLP**


/s/ Larry W. Gabriel
_____

By:    Larry W. Gabriel, Esq.
         585 Lorna Lane
         Los Angeles, California 90049
         Tel.  818/ 943-8992
         Email  lgabrielaw@outlook.com


**GLEICHENHAUS, MARCHESE & WEISHAAR, P.C.**


/s/ Scott J. Bogucki
_____

By:    Scott J. Bogucki, Esq.
         43 Court Street, Suite 930
         Buffalo, New York 14202-3100
         Tel.  716/ 845-6446
         Email   sbogucki@gmwlawyers.com

*Co-Counsel to Elissa D. Miller, Esq., Chapter 7 Trustee*
*appointed in In re Girardi Keese*

20

21